# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **WILLIAM R. LARSEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:09-CV-55** |
| | ) | |
| **FORT WAYNE POLICE** | ) | |
| **DEPARTMENT, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

## I. INTRODUCTION

What started as a typical family outing to Northrop High School on February 3, 2007, to attend a show choir competition culminated in Plaintiff William Larsen's arrest for disorderly conduct and resisting arrest, and subsequently, this surprisingly-complex federal lawsuit. After the charges were later dismissed, Larsen filed this 42 U.S.C. § 1983 action against Defendants Fort Wayne Police Officer Juan Barrientes, Fort Wayne Police Officer Allen Glock (together, the "Officers"), and Kevin Damerell, Northrop's Assistant Principal, advancing a host of claims, including excessive force, false imprisonment, malicious prosecution, and claims under the First Amendment.[1]

Now before the Court is a motion for summary judgment filed by the Assistant Principal Damerell concerning all of Larsen's claims (Docket # 23), and a motion for partial summary

---

[1] Subject matter jurisdiction arises under 28 U.S.C. § 1331. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

Larsen also advanced this suit against Fort Wayne Community Schools ("FWCS"), the Fort Wayne Police Department, and two unknown Fort Wayne police officers, John Doe #1 and Jane Doe #2. The parties have since stipulated to dismiss these Defendants with prejudice. (Docket # 57.)

judgment filed by the Officers (Docket # 25) against all claims other than Larsen's ¶ 1983 excessive force claim against them.[2] For the following reasons, Assistant Principal Damerell's motion will be GRANTED, and the Officers' motion will be GRANTED IN PART and DENIED IN PART.

## II.  FACTUAL BACKGROUND[3]

On February 3, 2007, a show choir competition was held at Northrop High School, a public school located in Fort Wayne, Indiana, in which numerous high school show choirs, including Carroll High School, participated. (Damerell Dep. 9-10;[4] Larsen Dep. 16-17, 21-23.) The competition, which was open to the public, was organized essentially as a fundraiser by Northrop's show choir "boosters", a volunteer group composed of parents (the "Boosters"). (Damerell Dep. 7, 9-10.)  Spectators were required to pay an eight dollar admission fee at a table staffed by the Boosters at the school's entrance. (Damerell Dep. 9-10; Glock Dep. 10, 51;[5] Larsen Dep. 25.)

_____

[2] Together with his reply brief, Assistant Principal Damerell filed a motion to strike certain evidence submitted by Larsen with his response brief. (Docket # 33.)  Because Damerell's summary judgment motion should be granted even when the evidence he seeks to strike is considered, the motion to strike will be DENIED AS MOOT. Moreover, the evidence that Damerell seeks to strike was immaterial in the Court's analysis of Larsen's false arrest claim against the Officers.  That is, the Court would deny summary judgment in the Officers' favor on Larsen's false arrest claim regardless of whether such evidence was considered.

In addition, Defendants filed motions to strike certain additional evidence submitted by Larsen with his supplemental response brief on his First Amendment retaliation claim. (Docket # 50, 53.)  Because Defendants' summary judgment motions on the retaliation claim should be granted even when the evidence they seek to strike is considered, the motions to strike will be DENIED AS MOOT.

[3] For summary judgment purposes, the facts are recited in the light most favorable to Larsen, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

[4] Unless otherwise noted, the citation to the Deposition of Kevin Damerell refers to his January 14, 2010, deposition, rather than his July 13, 2007, deposition.

[5] The citation to the Deposition of Allen Glock refers to his January 12, 2010, deposition, rather than his May 30, 2007, deposition.

As a fundraiser, the Boosters contracted with Huntington Media Services to professionally videotape the competition, which could then be purchased. (Damerell Dep. 15, 33-34; Damerell Aff. ¶ 3; Larsen Dep. 113; Karl Hans Dep. 9-10; Nancy Hans Dep 10-11; Bumpass Dep 7.)  As a result, no flash photography or videography was permitted during the competition.[6] (Damerell Dep. 12, 33; Karl Hans Dep. 9-10; Nancy Hans Dep 10-11; Bumpass Dep 7.)  Tom Moupin, Northrop's show choir director, was the designated signatory on the contract. (Pl.'s Designation of Evidence. Ex. S.)  Signs notifying spectators of this rule were posted at the admission table and on an easel at the end of the table; Larsen contends, however, that these signs were difficult to read. (Glock Dep. 8; Larsen Dep. 32-34; Baughan Dep. 9.)  No signs about the rule were posted outside the school or on any exterior entrance door. (Larsen Dep. 32-34; Baughan Dep. 9, 15.)

Larsen, who had earlier dropped off his wife, Lenore, and his daughter at the school, arrived at approximately 10:15 a.m. to watch his daughter perform with the Carroll High School show choir. (Larsen Dep. 21-23.)  He entered the school and approached the admission table, carrying a tripod and video camera case.[7] (Larsen Dep. 25.)  He purchased an admission ticket from a volunteer positioned at the table and then walked toward the gymnasium doors. (Larsen Dep. 29-30).  He then heard a volunteer shout at him from about forty feet away: "You can't take flash photographs or videotape in there!" (Larsen Dep. 31.)  Larsen asked why there were no signs stating that rule. (Larsen Dep. 32-33.)  The volunteer then pointed to the sign on the easel

---

[6] Apparently, this is relatively common in the high school show choir arena, as Larsen admitted that he attended another show choir competition the week before the Northrop event that also prohibited videotaping. (Larsen Dep. 18-19.)

[7] Larsen had personally videotaped nineteen events at Northrop, Wayne High School, and Snider High School since 2003 without encountering any complaints. (Larsen Aff. ¶¶ 3-5.)

3

near the admission table. (Larsen Dep. 32-33.)  Larsen remarked that whoever had put the signs there had done a poor job of placing them where people could see them. (Larsen Dep 32-34.)

The volunteer then offered to refund Larsen's admission price, but Larsen claimed that he was experiencing almost like a "bait and switch". (Larsen Dep. 34.)  He told the volunteer that since Northrop was public property he could videotape and photograph whatever he wanted. (Larsen Dep. 34.)  The volunteer explained to Larsen that the event had hired a professional videographer and that he was free to buy a copy of the video; Larsen responded, "Well, we will see about that," and proceeded to walk toward the gymnasium, still carrying his video equipment. (Larsen Dep. 34, 37.)

Fort Wayne Police Officer Allen Glock was off duty, working a part-time uniform security detail for FWCS at the Northrop event. (Glock Dep. 5.)  He was in full police uniform and was posted outside the Northrop gymnasium doors, where he could observe the admission table. (Glock Dep. 10.)  Officer Glock observed the exchange between Larsen and the volunteer, and noted that Larsen gave a rather agitated or aggravated response to the volunteer. (Glock Dep. 5, 10-13.)  As a result, he followed Larsen and watched him enter the double doors leading to the gymnasium. (Glock Dep. 13.)

At this point, Officer Glock, concerned about Larsen's demeanor, approached Larsen and informed him that no flash photography or videotaping was allowed.[8] (Larsen Dep. 39; Glock Dep. 16-18.)  Larsen responded that Northrop was public property and therefore he could

---

[8] Officer Glock contends that before he approached Larsen, he also saw him interact with two more volunteers about the videotaping rule, in which the volunteers suggested that Larsen return the video camera to his vehicle or leave it at the admission table. (Glock Dep. 13-14.)  Officer Glock claims that he heard Larsen rather heatedly refuse. (Glock Dep. 14.)  Larsen does not describe this additional encounter in his version of the events.

photograph or videotape anything he wished. (Glock Dep. 18-19; Larsen Dep. 40-41.) Officer Glock then told Larsen that if he caught him videotaping, he would be removed from the building. (Larsen Dep. 40-41; Glock Dep. 16, 18.) Larsen then questioned Glock's authority and identity, asking if he was law enforcement and if he was being paid by the school (Glock Dep 16-17); Glock, however, refused to identify himself (Larsen Dep. 40). Larsen told Officer Glock that if he was being paid by the school, he had no authority as a police officer. (Glock Dep. 17.) He also questioned whether FWCS had obtained consent to videotape his daughter and sell the recordings. (Larsen Dep. 40-41.) Finally, Officer Glock told Larsen that he had to follow the rules regarding no videography, and if not, he would be arrested. (Larsen Dep. 40-41.) Larsen responded: "Well, you do what you think you have to do." (Larsen Dep. 41.)

Larsen then left Officer Glock and entered the gym. (Larsen Dep 41.) As he was doing so, another volunteer stated: "I would like to remind everybody, there is no flash photography or videotaping allowed." (Larsen Dep. 41; Hartzler Dep. 13-14.) Larsen shot back: "The school doesn't have the right to videotape my daughter and sell her image to the public." (Larsen Dep. 41; Hartzler Dep. 13-14.) After entering the gym, Larsen found his wife and sat down with her to watch the competition, placing his video equipment under the seat. (Glock Dep. 20; Larsen Dep. 41-42; Lenore Dep. 20.)

Once Larsen took his seat, Officer Glock saw a fellow Fort Wayne police officer, Juan Barrientes, in the crowd. (Glock Dep. 22; Barrientes Dep. 11.[9]) Officer Barrientes was off duty and was at the competition to watch his daughter perform with the Garrett High School show

---

[9] The citation to the Deposition of Juan Barrientes refers to his January 12, 2010, deposition, rather than his May 30, 2007, deposition.

choir. (Barrientes Dep. 6-7.)  Though not in uniform, Officer Barrientes was wearing his police badge clip and his standard duty-issued weapon. (Barrientes Dep. 7, 12.)  Officer Glock informed Officer Barrientes about Larsen and warned him that Larsen might be a problem. (Barrientes Dep. 13-14; Glock Dep. 22-23.)  He asked Officer Barrientes to "keep an eye on him" and assist Officer Glock if necessary. (Barrientes Dep. 13-14; Glock Dep. 22-23.)

Officer Glock then approached Kevin Damerell, Northrop's Assistant Principal and administrative support to the Boosters' event, and discussed the situation with him. (Glock Dep. 24-25; Pl.'s Designation of Evidence Ex. X.)  Damerell had already been told by Northrop's choir director that some parents had reported to him that an adult had entered the school with a video camera and had responded rudely and argumentatively when told of the videotape restrictions. (Damerell Dep. 32.)  At this point, Officer Glock asserts that Damerell told him that if the situation deteriorated further or if Larsen attempted to use his video camera, he should be removed from the building.[10] (Glock Dep. 24-25.)

Once seated, Larsen discussed the "no videography" rule with his wife Lenore, inquiring whether she had signed any consents for their daughter to be videotaped. (Larsen Dep. 45-47; Lenore Dep. 34-35.)  Lenore then got up and asked a FWCS official whether non-flash photography was permitted; the official responded in the affirmative. (Larsen Dep. 46; Lenore Dep. 20, 35.)  Seeing that he still had a few minutes before the next performance, Larsen told his wife: "I am going to see if I can't find that official and talk to him about the consent and releases.  They obviously don't know what they are doing here." (Larsen Dep. 47.)  At that point, after having been seated for approximately three minutes, Larsen got back up and approached

---

[10] Assistant Principal Damerell, however, made no mention of such statement in his own deposition..

Damerell. (Glock Dep. 24; Larsen Dep. 45-47.)

Once he confirmed that Damerell was indeed a school official, Larsen asked: "Maybe you can answer a question for me?" (Larsen Dep. 48.)  Larsen then questioned Damerell about the no videography rule and whether the school had obtained releases from the performers, stating that he had not given such consent on his daughter's behalf. (Larsen Dep. 48-49.) Damerell stated that he did not know whether consents were obtained, and Larsen responded: "Well, it is my experience, in years of photography, that if you wish to videotape and sell a person's image, you need permission of anybody whose identifiable in that image before you sell it." (Larsen Dep. 48-49.)  Damerell then suggested that the show choir application completed by the choir director probably provided the authorization, but Larsen stated: "My daughter is a minor and neither my wife nor I have signed any type of authorization.  Certainly a show choir director doesn't have consent to authorize this on behalf of somebody else." (Larsen Dep. 49.)

Finally, Damerell suggested to Larsen that if he did not want his daughter to be videotaped, he could remove her from the competition. (Larsen Dep. 49; Damerell Dep. 38-39.) Larsen responded: "You are missing the point I am trying to make.  Unless you have the consent and release of every performer here, you can videotape, but you can't sell them; otherwise you could face unforeseen consequences." (Larsen Dep. 49.)  Damerell simply responded that he "look[ed] forward to hearing from [Larsen]" and then turned around and walked away. (Larsen Dep. 49.)  Damerell states that during this interaction, which he describes as a "discussion", he never perceived Larsen as a threat to his or anyone else's safety and describes him as "argumentative". (Damerell Dep. 15, 17, 24, 26; Damerell Dep. 28, July 13, 2007.)

Observing Larsen's exchange with Damerell, Officer Glock became concerned about

Damerell's safety, perceiving Larsen's demeanor as belligerent and boisterous. (Glock Dep. 28-29.)  Consequently, Officer Glock approached the two men and told Larsen that if he videotaped the event, he would be arrested.[11] (Glock Dep. 29; Larsen Dep 49-50.)  Larsen again asked Officer Glock to identify himself, but Officer Glock refused. (Larsen Dep. 51.)  Larsen then asked Officer Glock what law prohibited him from videotaping, what probable cause he had, and what the charges would be to arrest him. (Larsen Dep. 52.)  Larsen also said that he had paid his eight dollars and he was not leaving. (Larsen Dep. 53-54.)  When asked by Officer Glock whether he would resist arrest, Larsen responded: "No.  I am a disabled vet, I have a difficult time standing, let alone walking.  I am not going to resist." (Larsen Dep. 53.)

At this point, Officer Glock asked Damerell if his admission price could be refunded, and Damerell responded in the affirmative.[12] (Larsen Dep. 53.)  Officer Glock then asked Larsen to "please leave." (Glock Dep. 31; Larsen Dep. 53.)  Larsen refused, claiming that the officers did not have the authority to stop him and stating that he had paid his admission fee and therefore he was going to sit down and watch the show. (Larsen Dep. 53-54; Barrientes Dep. 20; Glock Dep. 31.)  He then walked to his seat and sat down next to his wife, closed his eyes, and attempted to perform some deep breathing and relaxation techniques that he had learned in physical therapy. (Larsen Dep. 53-54; Barrientes Dep. 20; Glock Dep. 31.)  Larsen states that he has no

---

[11] The Officers contend that at this point Officer Barrientes, who had been watching Larsen, also approached the three men. (Glock Dep. 29-30; Barrientes Dep. 18-19.)  He asserts that he identified himself to Larsen as an off-duty Fort Wayne police officer and that Larsen immediately challenged his authority. (Glock Dep. 29-30; Barrientes Dep. 18-19.)  He further contends that he told Larsen that they would "afford him every courtesy and treat him with dignity and respect, and that he would not be permitted to stay if he continued being disruptive." (Barrientes Dep. 19.)  Larsen, however, maintains that Officer Barrientes never spoke with him and never identified himself as an off-duty police officer. (Larsen Dep. 59, 67.)

[12] Officer Barrientes contends that it was he, rather than Officer Glock, who inquired whether Larsen's admission fee could be refunded. (Barrientes Dep. 20.)

recollection of the time between when he sat down for the last time to when he saw Lenore speaking with someone in Northrop's common area about twenty minutes later. (Larsen Dep. 54; Resp. Br. 20.)

Meanwhile, the Officers and Damerell decided that, because Larsen refused to follow the officers' orders, he would be escorted from the building. (Glock Dep. 31; Damerell Dep. 35-36.) As a result, Officers Barrientes and Glock followed Larsen to his seat. (Barrientes Dep. 21.) Officer Barrientes asserts that he tried to talk reasonably with Larsen about leaving but to no avail. (Barrientes Dep. 21.) Officer Barrientes states that he finally commanded Larsen to leave the premises but that Larsen allegedly responded, "You can't make me do anything." (Barrientes Dep. 25.) While Larson has no memory of these events, Lenore, who was sitting next to him, admits that she heard the officer twice repeat the command to leave, stating that "[t]he whole incident happened so fast between 'Sir, you've got to leave,' and then him being yanked out of the auditorium . . . [that] it was like one, two, three." (Lenore Dep. 38.)

In any event, Larsen asserts that he was quietly sitting in his seat (Larsen Dep. 59; Lenore Dep. 38-39; Simmons Dep. 12), when Officer Barrientes approached him from behind without identifying himself as a police officer and yanked him out of his folding chair by his neck in what appeared to be a choke hold or headlock.[13] (Baughan Dep. 22; Lenore Dep. 39-40; Pl.'s Designation of Evidence Exs. DD, V.) Larsen immediately had a seizure and fell unconscious,

_____

[13] In contrast, Defendants contend that Officer Barrientes grabbed Larsen by the arm to escort him from his seat, and that Larsen immediately jerked his arm away. (Barrientes Dep. 27.) They further assert that Larsen stood up, turned to face Officer Barrientes, and took an aggressive stance. (Barrientes Dep. 29.) Officer Barrientes states that he then grabbed Larsen's "arm and his shoulder to pull him away from the chair and that is when he went limp." (Barrientes Dep. 29.)

Officer Glock, however, represented in his narrative report after the incident that Officer Barrientes "placed a headlock on the subject." (Pl.'s Designation of Evidence Ex. V.)

going limp in Officer Barrientes's arms.[14] (Barrientes Dep. 29; Larsen Dep. 56-57.) Officers Barrientes and Glock then physically dragged the unconscious Larsen from the gymnasium, a distance of about fifty feet. (Barrientes Dep. 30; Glock Dep. 36-37; Bumpass Dep. 16, 22-23; Conklin Dep. 13, 15, 17; Karl Hans Dep. 15-16, 26; Nancy Hans Dep. 14.)

Once Larsen was removed from the gymnasium, Officer Barrientes arrested him for disorderly conduct and resisting law enforcement. (Barrientes Dep. 39-40, 42-43, 47.) He was also given a "no trespass" notice, warning Larsen that he was no longer permitted on Northrop's premises. (Larsen Dep. 56.) All of the charges against Larsen were later dismissed. (Barrientes Dep. 42-43; Larsen Dep. 90.)

Larsen had visible marks on his neck eight to ten hours after the incident. (Baughan Dep. 22; Lenore Dep. 59, 81; Pl.'s Designation of Evidence Ex. DD.) His throat was swollen, his left elbow and right shoulder were bruised, and his upper center chest area was sore. (Larsen Dep. 77; Lenore Dep. 81.) He has been treated on a weekly basis since the incident for neck and back pain and reduced mobility. (Larsen Dep. 77; Pl.'s Designation of Evidence Ex. DD.) Due to a sudden increase in petite seizures, Larsen has been placed on Dilantin, which he contends slows his thinking and adversely affects his short term memory and coordination. (Pl.'s Designation of Evidence Ex. EE.)

### III.  STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(c); *Payne*, 337 F.3d at 770.

---

[14] Larsen states that he suffers from a seizure disorder as a result of an injury he incurred when in the United States Navy. (Resp. Br. 20; Pl.'s Designation of Evidence Ex. EE.)

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005).

When ruling on a motion for summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne*, 337 F.3d at 770. The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.*; *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.

A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771; *Scott v. Harris*, 550 U.S. 372, 380 (2007) (instructing that in determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.").

## IV. DISCUSSION

### A. Larsen Has Abandoned All Claims Other Than His § 1983 False Arrest and First Amendment Claims

In his complaint, Larsen advanced a host of claims against Defendants under 42 § 1983, including false arrest, malicious prosecution, excessive force, and claims under the First

Amendment; as well as numerous state law claims, including negligent and intentional infliction of emotional distress and abuse of process.  However, in response to Defendants' motions for summary judgment, Larsen addressed only his § 1983 claims of false arrest and his claims under the First Amendment.[15]  Of course, any issues raised in the summary judgment motion that are not responded to by the non-moving party are deemed abandoned. *See* Fed. R. Civ. P. 56(e)(2); *Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003) (collecting cases).

In any event, after the briefing of the motions for summary judgment was completed, the parties stipulated to dismiss with prejudice Larsen's claims of "abuse of process, malicious prosecution under state and federal law, negligent infliction of emotional distress, and intentional infliction of emotional distress". (Docket # 57.)  Consequently, summary judgment will be entered in Defendants' favor with respect to all of Larsen's claims subject to the summary judgment motions, except however, his § 1983 false arrest and First Amendment claims.[16]  These remaining claims will each be discussed in turn.

---

[15] Larsen also addressed his § 1983 excessive force claim against the Officers in his response brief. However, Larsen's arguments on this point are irrelevant since the Officers did not move for summary judgment on his excessive force claim.  As stated *supra*, that claim survives.

[16] Moreover, since Larsen alleges in his complaint that Officer Glock and Officer Barrientes were "acting in their official capacities as police officers" and that Assistant Principal Damerell was "acting in his capacity as an employee of FWCS", and thus fails to make any assertion that they acted outside the scope of their employment (Compl. ¶¶ 4, 6), they are immune from any state law claims pursuant to the Indiana Tort Claims Act. Ind. Code § 34-13-3-5 (explaining that a lawsuit alleging that a public employee acted within the scope of the employee's employment bars an action by the plaintiff against the employee personally).

### B. Larsen's False Arrest Claim

Defendants assert that summary judgment is appropriate on Larsen's false arrest claim because the Officers had probable cause to arrest him. Ultimately, the Defendants' arguments are not persuasive.

1. Applicable Law

"Probable cause is an absolute defense to a claim of wrongful arrest asserted under section 1983 against police officers." *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *see also Gomez v. Adams*, 462 N.E.2d 212, 222 (Ind. Ct. App. 1984) ("Proof of absence of probable cause is essential to a recovery for false arrest."); *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1104 (S.D. Ind. 2008) ("Generally, to succeed upon a claim of false arrest or false imprisonment, Indiana law requires a plaintiff to establish the absence of probable cause for the arrest."). Moreover, "[w]here an individual is arrested on multiple charges, a finding of probable cause for any one of the charges is sufficient to negate a § 1983 claim for false arrest." *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1102 (S.D. Ind. 2008); *see Ochana v. Flores,* 347 F.3d 266, 271 (7th Cir. 2003).

"A police officer has probable cause to arrest 'if, at the time of the arrest, the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Chelios*, 520 F.3d at 686 (quoting *Wagner v. Washington County*, 493 F.3d 833, 836 (7th Cir. 2007)) (internal quotation marks omitted); *see also N.J. ex rel. Jackson v. Metro. Sch. Dist. of Washington Twp*., 879 N.E.2d 1192, 1195 (Ind. Ct. App. 2008) ("Probable cause for arrest is demonstrated by facts and

circumstances known to the arresting officer which would warrant a person of reasonable caution and prudence in believing that the accused had committed or was committing a criminal offense." (citation omitted)).

2. Analysis

Defendants argue that summary judgment is warranted in their favor on Larsen's false arrest claim because they had probable cause to arrest him for resisting law enforcement or in the alternative, criminal trespass, a closely-related crime with which he was not ultimately charged.[17] Defendants do not particularly argue that probable cause existed for the disorderly conduct charge, but instead emphasize that as long as probable cause exists for at least one charge, it is not necessary to establish evidence of probable cause for other charges. *Biddle v. Martin*, 992 F.2d 673, 677 (7th Cir. 1993). In addition, the Officers assert that they are entitled to the protection of qualified immunity from Larsen's false arrest claim.

Under Indiana law, the crime of "resisting law enforcement" occurs when a person "knowingly or intentionally . . . forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of the officer's duties . . . ." Ind. Code § 35-44-3-3(a)(2). "The law in Indiana is well settled that 'forcibly' modifies all of the relevant verbs, 'resists, obstructs or interferes . . . .'" *Blair v. City of Evansville, Ind.*, 361 F. Supp. 2d 846, 860-61 (S.D. Ind. 2005) (quoting *Spangler v. State*, 607

---

[17] Larsen does not assert in his response brief that he is advancing a § 1983 false arrest or excessive force claim against Assistant Principal Damerell, and therefore any such claim has been abandoned. *See Palmer*, 327 F.3d at 597-98.

Furthermore, though Damerell admits that at a certain point he decided Larsen should leave the building, Larsen has not pointed to *any* evidence that Damerell asked or encouraged the Officers to use force or to arrest him. Thus, any Fourth Amendment claim against Damerell fails at the outset. *See Whitford v. Boglino*, 63 F.3d 527, 530-31 (7th Cir. 1995) (explaining that to state a claim under § 1983, plaintiff must show that defendants were "personally involved" in the deprivation of his constitutional rights).

N.E.2d 720, 723 (Ind. 1993)). "In addition, the Indiana Supreme Court has defined 'forcibly' to mean the use of 'strong, powerful, violent means . . . to evade a law enforcement official's rightful exercise of his or her duties." *Id.* (quoting *Spangler*, 607 N.E.2d at 723). "A verbal refusal is not sufficient—some physical sign of resistance is necessary before the statute is violated." *Morfin v. City of East Chicago*, 349 F.3d 989, 997 (7th Cir. 2003).

Here, Larsen suggests that the Officers lacked probable cause to arrest him for resisting law enforcement because Officer Glock never ordered him to leave during their second verbal exchange. As Larsen recalls the events, Officer Glock confirmed with Assistant Principal Damerell that Larsen's admission fee could be refunded and then asked Larsen: "Will you please just leave?" (Larsen Dep. 53.) As Larsen tells it, he perceived Officer Glock's statement as an invitation or opportunity to leave with a full refund of his admission fee, but not a direct order.[18] Not surprisingly, Officer Glock recalls this exchange differently, asserting that he told Larsen "that it was going to be necessary for him to leave, or we would physically remove him from the building." (Glock Dep. 31.) Therefore, a material dispute of fact exists concerning whether Officer Glock actually ordered Larsen to leave the premises during their second verbal exchange.

Furthermore, even if Officer Glock did order Larsen to leave during their second verbal exchange, there is absolutely no evidence of record that Larsen acted "forcibly" in his refusal to comply. *Spangler*, 607 N.E.2d at 723; *see Wellman v. State*, 703 N.E.2d 1061, 1064 (Ind. App. 1998) ("[F]orce is used when an individual directs strength, power or violence towards police

---

[18] Moreover, though Larsen alleges in his complaint that at "all times" the Officers were "acting in their official capacities as police officers", his testimony suggests that he may have had some confusion about whether Officer Glock was actually acting in his capacity as "law enforcement" when he learned that Glock was off duty and was paid by the school. (Larsen Dep. 51.) Also, according to Larsen, Officer Glock refused to give him his name or badge number. (Larsen Dep. 51)

officers, or when he makes a threatening gesture or movement in their direction.") (citations and internal quotation marks omitted).  That is, there is no evidence to suggest that Larsen used "strong, powerful, violent means" to evade Officer Glock's request that he leave the event. *Id.*; *see Phelps v. City of Indianapolis*, No. 1:02-CV-1912-DFH, VSS, 2004 WL 1146489, at *8-9 (S.D. Ind. May 10, 2004) (concluding that there was no probable cause for resisting law enforcement where plaintiff criticized the police but did not physically interfere with them or threaten to do so); *Huber v. Reagan*, No. NA 99-29-C H/S, 2000 WL 684231, at *5 (S.D. Ind. Apr.25, 2000) (same).  Rather, Larsen retreated from Officer Glock and quietly took his seat in the gymnasium.[19] *See Blair*, 361 F. Supp. 2d at 861 (declining to find probable cause for resisting arrest where plaintiff eventually retreated from his verbal sparring match with the officer).

As to Larsen's interaction with Officer Barrientes, Larsen's wife admits that Officer Barrientes twice ordered Larsen to leave after he sat down for the second time.  Larsen

---

[19] The Officers rely upon *Potts v. City of Lafayette, Indiana*, 121 F.3d 1106 (7th Cir. 1997), to support a probable cause finding.  In *Potts*, the plaintiff attempted to enter a Klu Klux Klan rally with a tape recorder after he was instructed that he could not enter with the tape recorder. *Id.*  The Seventh Circuit Court of Appeals, affirming the district court's finding of probable cause, stated:

> Upon being instructed not to enter with his tape recorder, Potts made a movement in the direction of the rally and indicated that the officers would have to arrest him in order to stop him from going in.  Potts's step toward the entrance of the rally, in response to the officers' lawful orders to stay out of the rally if he did not relinquish the tape recorder, constitutes 'force' as that term is understood in the context of interfering with officers' duties.  Potts forced himself into a position in which he was not permitted to be.  An officer has a right to enforce a lawful order even if that means arresting a person who verbally refuses to obey the order and then makes a movement in furtherance of his goal of disobedience.  The idea that an officer has to wait until he is belted across the mouth before effecting an arrest is too absurd to discuss.

*Id.* at 1113.

> *Potts* is distinguishable from the instant circumstances.  In *Potts*, the officers ordered the plaintiff to stay out of the rally if he did not relinquish the tape recorder.  Here, there is a material issue of fact concerning whether Officer Glock ever ordered Larsen to leave the premises, and Officer Glock certainly never ordered him to relinquish his video equipment.  Rather, Officer Glock simply ordered Larsen not to videotape and warned him that if he did, he would be arrested.  Of course, there is no dispute that Larsen never did actually videotape the event or, for that matter, make any physical movement to remove his video equipment from its carrying case beneath his seat.

emphasizes, however, that he was sitting quietly in his seat at the time and offered no sign of physical resistance. *See Blair*, 361 F. Supp. 2d at 862 (finding no probable cause existed where plaintiff refused to move for a period of time and then started to move away from the protest zone). Moreover, according to Larsen's wife, Officer Barrientes did not allow Larsen any time to peacefully comply with his order to leave the premises before he employed physical force. *See, e.g.*, *Huddleston v. Pohlman*, No. 06-3009, 2007 WL 118873, at *6 (C.D. Ill. Jan. 10, 2007) (finding that a reasonable jury could find that officer lacked probable cause where the officer afforded plaintiff only a "small window of time" to comply with officer's order to leave the premises before arresting him); *see generally Johnson v. Scott*, No. 1:07-CV-155, 2008 WL 3874690, at *7 n.6 (N.D. Ind. Aug. 14, 2008) (granting summary judgment in favor of officer on plaintiff's excessive force claim where plaintiff had many opportunities to peacefully surrender before the officer released a police dog to apprehend him). Therefore, on this record, a reasonable juror could conclude that neither Officer had probable cause to arrest Larsen for resisting law enforcement.

Nevertheless, this does not end our inquiry. As Defendants suggest, the Seventh Circuit Court of Appeals has held that "probable cause need not have existed for the charge for which plaintiff was arrested, so long as probable cause existed for arrest on a closely related charge." *Biddle*, 992 F.2d at 676; *see Fox v. Hayes*, 600 F.3d 819, 837 (7th Cir. 2010) ("[A]n arrest is reasonable under the Fourth Amendment so long as there is probable cause to believe that *some* criminal offense has been or is being committed, even if it is not the crime with which the officers initially charge the suspect.") (emphasis in original); *Williams v. Jaglowski*, 269 F.3d 778, 783 (7th Cir. 2001) ("Police officers are not required to be legal scholars."); *Kelley v.*

*Myler*, 149 F.3d 641, 647-48 (7th Cir. 1998); *Harper v. Mega*, No. 96 C 1892, 1998 WL 473427, at *5-6 (N.D. Ill. Aug. 7, 1998); *Kohilas v. City of Chicago*, No. 92 C 7853, 1995 WL 431243, at *3 (N.D. Ill. July 19, 1995). "In order to rely on a closely-related charge, . . . the officers must show that the charge can reasonably be based on the same set of facts that gave rise to the arrest and that the charge offered as justification is one that would [have recommended] itself to a reasonable police officer acting in good faith at the time the arrest was made." *Williams*, 269 F.3d at 783 (alteration in original; internal quotation marks and citation omitted).

Defendants assert that regardless of whether probable cause existed for the charges of disorderly conduct and resisting arrest, probable cause existed for the closely-related charge of criminal trespass. Under Indiana law, a person who "not having a contractual interest in the property, knowingly or intentionally refuses to leave the real property of another person after having been asked to leave by the other person or that person's agent" commits "criminal trespass". Ind. Code § 35-43-2-2(a)(2). Courts have found the charge of criminal trespass to be closely related to resisting arrest and disorderly conduct. *See, e.g., Kelley*, 149 F.3d at 647-48 (finding that criminal trespass and resisting law enforcement are sufficiently related charges); *Kies v. City of Aurora*, 156 F. Supp. 2d 970, 982 (N.D. Ill. 2001) (treating charges of disorderly conduct and criminal trespass as reasonably related); *Kohilas*, 1995 WL 431243, at *3 (concluding that where plaintiff was arrested for disorderly conduct, probable cause for that charge was lacking under plaintiff's version of the facts, but probable cause still existed on the related charge of criminal trespass).

The Officers' alternative probable cause argument, however, is also unconvincing, as a material factual dispute exists preventing summary judgment on this basis. According to

Larsen's telling of the events, only Officer Glock asked him to leave the school premises. Defendants assert, however, that both Officer Glock *and* Assistant Principal Damerell ordered Larsen to leave the premises. (Officers' Mem. In Supp. 9-10 ("Damerell said, 'It is time to go.' Larsen refused to do so, *and at that point*, the officers had probable cause to arrest Larsen for Criminal Trespass." (emphasis added and citation omitted)); *see Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 763 ((7th Cir. 2005) ("The right to shoo away strangers belongs to the owner of the property and [its] agents."). Therefore, this material factual dispute concerning Defendants' alternative argument for finding probable cause prevents summary judgment on Larsen's false arrest claim.

Moreover, "[t]he belief that one has a right to be on the property of another will defeat the mens rea requirement of the criminal trespass statute if it has a fair and reasonable foundation." *Taylor v. State of Indiana*, 836 N.E.2d 1024, 1028 (Ind. Ct. App. 2006); *see also Olsen v. State*, 663 N.E.2d 1194, 1196 (Ind. Ct. App. 1996). Here, Larsen's payment of the eight dollar admission fee (arguably, in Larsen's mind, a "contractual interest") at a public school could cause a reasonable juror to conclude that Larsen's belief that he was entitled to remain on the premises had a "fair and reasonable foundation". *Taylor*, 836 N.E.2d at 1028 ("It is for the trier of fact to determine whether [Larsen] believed that he had a right to be on the property . . . and whether that belief had a fair and reasonable foundation." (citing *Myers v. State*, 130 N.E. 116, 117 (Ind. 1921)). Therefore, this further bolsters the denial of summary judgment to the Officers.

The Officers also argue that they are entitled to the protection of qualified immunity on Larsen's false arrest claim. Police officers (as well as public school officials) are generally

protected by qualified immunity "if their allegedly unlawful actions meet the test of objective legal reasonableness . . . assessed in the light of the legal rules that were clearly established at the time the actions were taken." *Hughes v. Meyer*, 880 F.2d 967, 970 (7th Cir. 1989) (citation and internal quotation marks omitted); *Ulichny v. Merton Cmty. Sch. Dist.*, 249 F.3d 686, 705-06 (7th Cir. 2001); *Chelios,* 520 F.3d at 690-91. Thus, it "protects those officers who make a reasonable error in determining whether there is probable cause to arrest an individual." *Chelios*, 520 F.3d at 690-91.

Viewing all the evidence in the light most favorable to Larsen, it is clearly-established that a police officer may not arrest a person for resisting law enforcement where he did not issue a definitive order and that person merely verbally sparred with the officer, did not exhibit "force" toward the officer, and then eventually retreated from the officer. *See Ryan-Louie v. DeFazio*, No. 2:05-CV-249 PS, 2007 WL 433067, at *7 (N.D. Ind. Feb. 2, 2007) ("Indiana law is clear that a subject who does not more than swear at an officer and invite him to arrest her does not resist law enforcement." (citing *Spangler*, 607 N.E.2d at 722)); *Blair*, 361 F. Supp. 2d at 865 (denying qualified immunity to police officers who arrested protester who engaged in "verbal sparring match" with officer and refused to move); *Huber*, 2000 WL 684231, at *5 (denying qualified immunity where plaintiff shouted at the police but never made a physical movement in furtherance of disobedience or invited the officer to arrest him).

Likewise, it is clearly-established that an officer acting in his official capacity may not arrest a person for criminal trespass when the owner or the owner's agent has not asked him to leave the premises. *See Pourghoraishi*, 449 F.3d at 763. Here, according to Larsen's version of the facts, Assistant Principal Damerell never asked him to leave the school; rather, it was Officer

Glock who asked him to leave the school with a refund of the ticket price. Taking the facts in the light most favorable to Larsen and giving him every inference, Officer Glock was acting solely in his capacity as a police officer, rather than as an agent of the school, and thus Larsen's failure to comply with Officer Glock's request that he leave the premises does not give rise to probable cause for criminal trespass. *Id*. at 764. Furthermore, it is undisputed that Larsen had not violated the "no videography" rule, or for that matter any other school rule, at the time Officer Glock asked him to leave. *See Travis v. State*, 812 N.E.2d 826, 829-30 (Ind. Ct. App. 2004) (concluding that police officers did not have authority to ban citizens from a public park indefinitely and therefore the officer who caught plaintiff violating park rules would have had probable cause to arrest plaintiff for criminal trespass if he had refused to leave the park at that time, but no probable cause existed when plaintiff returned at a later date and was complying with park rules). Consequently, when viewing the evidence in the light most favorable to Larsen and affording him every reasonable inference, the Officers are not entitled to qualified immunity on his false arrest claim as a matter of law. Therefore, the Officers' motion for summary judgment on Larsen's false arrest claim will be denied.

### C. First Amendment Claims

Larsen suggests that Defendants violated his rights under the First Amendment in two ways: first, by prohibiting him from videotaping the show choir performances, and second, by retaliating against him after he questioned Officer Glock and Assistant Principal Damerell about the no videography rule. Ultimately, neither of Larsen's First Amendment claims survive summary judgment.

1. First Amendment Claim Arising From No Videography Rule

"It is well established that in order to be protected under the First Amendment, images must communicate some idea." *Porat v. Lincoln Towers Cmty. Ass'n*, No. 04 Civ. 3199(LAP), 2005 WL 646093, at *4 (S.D.N.Y. Mar. 21, 2005). More specifically, to achieve protection under the First Amendment, a plaintiff must show that he possessed (1) a message to be communicated, and (2) an audience to receive this message, regardless of the medium in which the message is to be expressed. *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Group of Boston*, 515 U.S. 557, 568 (1995); *Porat*, 2005 WL 646093, at *4. Therefore, the taking of photographs or videography, without more, is not protected by the First Amendment. *Porat*, 2005 WL 646093, at *5; *Gilles v. Davis*, 427 F.3d 197, 212 n.14 (3rd Cir. 2005) (stating that videotaping does not constitute a protected First Amendment activity unless it "gather[s] information about what public officials do on public property" or "has a communicative or expressive purpose"). The First Amendment is not implicated because a person uses a camera, but rather, when that camera is used "as a means of engaging in protected expressive conduct", *Porat*, 2005 WL 646093, at *5, or, less commonly, to "gather information about what public officials do on public property", *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000).

Here, Larsen does not argue that he was attempting to express or communicate an idea through his proposed videography of the show choir invitational or that he was gathering information about what public officials do on public property. Rather, he stated that he wanted to videotape the performance simply for his personal archival purposes, that is, "for family documentation of [his daughter's] childhood". (Resp. Br. 11.) The First Amendment, however, does not protect purely private recreational, non-communicative photography. *Porat*, 2005 WL 646093, at *5; *see Dreibelbis v. Scholton*, No. 4:CV 05-2312, 2006 WL 1626623, at *3-4 (M.D.

Pa. June 7, 2006); *Montefusco v. Nassau County*, 39 F. Supp. 2d 231, 242 n.7 (E.D.N.Y. 1999).

Therefore, Larsen's proposed videography does not qualify for First Amendment protection. *Cf.*

*Davis v. Stratton*, 575 F. Supp. 2d 410, 421 (N.D.N.Y. 2008) (finding plaintiff's act of

videotaping his preaching of the Gospel on a college campus protected by the First Amendment

because it communicated a message and he later posted the recordings on the web), *reversed on*

*other grounds by*, No. 08-4972-cv, 2010 WL 76289 (2nd Cir. N.Y. Jan 11, 2010).

Furthermore, even if Larsen's proposed videography was protected by the First

Amendment, "the general rule [is] that a school is not presumed to be a public forum." *Mnyofu v.*

*Bd. of Educ. of Rich Twp. High Sch. Dist.*, *227*, No. 03 C 8717, 2007 WL 1308523, at *7 (N.D.

Ill. Apr. 27, 2007) (quoting *Vukadinovich v. Bd. of Sch. Trs. of Mich. City Area Schs.*, 978 F.2d

403, 409 (7th Cir. 1992)).  And here, there is no evidence to suggest that in hosting the February

3, 2007, show choir invitational, the school was open to anyone for "indiscriminate use". *Id.*

Because the school was a nonpublic forum, it is entitled to impose restrictions on speech

provided that the restrictions are reasonable. *Id.*; *see also Pfeifer v. City of West Allis*, 91 F.

Supp. 2d 1253, 1259 (E.D. Wis. 2000).  Considering that a purpose of the show choir invitational

was to serve as a fundraiser for Northrop's show choir and the sale of the professional video

would raise funds for the choir, the no videography rule was a reasonable restriction to further

that purpose. *See, e.g.*, *D'Amario*, 639 F. Supp. at 1544 (finding no fault with a "no camera" rule

enforced on the public attending a rock concert at a public facility).

Moreover, concerning any claim Larsen may have that Defendants unconstitutionally

restricted his right to "receive and record information"*, see Whiteland Woods, L.P. v. Twp. of*

*West Whiteland*, 193 F.3d 177, 183 (3rd Cir. 1999), rather than simply restrict his expression,

that too is unsuccessful. The restriction against videography did not "meaningfully interfere" with a spectator's ability to inform himself or herself about the show choir event. *Id.* That is, the rule prohibiting videography regulated the "manner" in which access by spectators occurred, not the spectator's underlying right of access to the event. *Id.* Spectators were free to attend the performance and gather information "by means other than by videotaping", including non-flash photography. *Id.* Accordingly, Larsen has failed to show that the restriction against videography at the show choir event violated his First Amendment rights. *See D'Amario*, 639 F. Supp. at 1543 (concluding that a public civic center's invocation of a "no camera" rule by request of the musical performer "sails past . . . scrutiny without difficulty"); *see generally Carlow v. Mruk*, 425 F. Supp. 2d 225, 247-48 (D.R.I. 2006) (collecting cases holding that "prohibitions on videotaping public meetings do not violate the First Amendment").

In addition, Defendants are entitled to qualified immunity on Larsen's claim that the no videography rule violated his First Amendment rights. Once a defendant raises this defense, "[t]he plaintiff bears the burden of demonstrating the violation of a clearly established right." *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008); *Erwin v. Daley*, 92 F.3d 521, 525 (7th Cir. 1996). Here, Larsen has failed to point to any case law that clearly establishes that restricting spectators from videotaping a student choir performance held at a public school violates the First Amendment. Therefore, Larsen has failed to defeat Defendants' qualified immunity defense, and they are also entitled to summary judgment on this alternative basis.

2. <u>Retaliation Claim Under the First Amendment</u>

Larsen also claims that the Officers and Assistant Principal Damerell retaliated against him in violation of the First Amendment as a result of his questioning the no videography rule.

This claim too is ultimately unsuccessful.

First Amendment retaliation actions require a three-step analysis.[20] *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285 (1977); *Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010). First, the Court must decide whether the party's speech was constitutionally protected; if so, the Court then examines whether retaliatory conduct would "deter First Amendment activity in the future," and whether the speech substantially motivated the retaliation. *Watkins*, 599 F.3d at 6 (quoting *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)); *see Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004). Ultimately here, Larsen's speech was unprotected because his comments focused on purely private concerns, causing the retaliation claim to fail at the outset. *Bivens v. Trent*, 591 F.3d 555, 559-60 (7th Cir. 2010); *Dishnow v. Sch. Dist. of Rib Lake*, 77 F.3d 194, 198 (7th Cir. 1996) (explaining that if the speech lacks protection, the "case is at an end").

The constitutional protection of Larsen's speech necessarily implicates the *Connick-Pickering* public concern test. *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 571-72 (1968); *Connick v. Myers*, 461 U.S. 137, 147-48 (1983). The First Amendment shields expressions from retaliatory action if they address "a matter of public concern . . . determined by the content, form, and context of a given statement . . . ." *Connick*, 461 U.S. at 147. Content is the most important of the three elements, *Button v. Kibby-Brown*, 146 F.3d 526, 529 (7th Cir. 1998) (citing *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219 (7th

---

[20] First developed in public employment cases, the test is now routinely applied outside that context, particularly to situations like this one. For example, the Seventh Circuit of Court of Appeals in *Landstrom v. Illinois Department of Children and Family Services*, 892 F.2d 670, 679-80 (7th Cir. 1990), employed the public concern analysis in a retaliation case involving a parent's speech to school officials. *See also Clark v. W. Contra Costa Unified Sch. Dist.*, No. C 98-4884-CRB, 2000 WL 336382, at *8 (N.D. Cal. 2000) (describing the public employee doctrine as a "useful starting point" for analyzing the constitutional status of parental speech at school).

Cir. 1994)), and is a question of law for the Court to determine. *Cliff v. Bd. of Sch. Comm'rs of Indianapolis*, *Ind*., 42 F.3d 403, 409 (7th Cir. 1994). The test functions to separate personal disputes only incidentally connected to the public interest, from speech with a broader primary purpose, such as "to bring wrongdoing to light." *Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir. 1985); *Swank v. Smart*, 898 F.2d 1247, 1252 (7th Cir. 1990). Yet, even statements addressing public concerns, the supposed "wrongdoing," for instance, remain unprotected if the comments only relate the issue to its effects upon the speaker. *Marshall*, 32 F.3d at 1219.

The context and form elements of the test require interpreting the speaker's motivation and the circumstances surrounding the speech. While private goals do not automatically exclude speech from public concern status, they often provide strong evidence that the expression emanates from concerns peculiar to the individuals involved. *Linhart*, 771 F.2d at 1010 (explaining that the "test requires us to look at the point of the speech in question"); *compare Smith v. Fruin*, 28 F.3d 646, 651-52 (7th Cir. 1994) (concluding that employee's complaints about second hand smoke were unprotected because he made them "on his own behalf and in his own interest"), *with Wainscott v. Henry*, 315 F.3d 844, 850-51 (7th Cir. 2003) (finding that speech was protected where plaintiff had no personal or pecuniary interest in the subject matter of the speech). Finally, the "manner, time, and place" of the speech is relevant. *Connick*, 461 U.S. at 152. Expressions made in private settings can be protected, *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 414-16 (1979), but such circumstances "tend[] to confirm their personal nature." *Fruin*, 28 F.3d at 653. This last point is illustrated in *Landstrom*, 892 F.2d at 678-79, a case in which parents requested that school officials stop physical examinations of their children and it was held that the speech, "privately and directly communicated," dealt with a personal

matter rather than an issue of public concern. *Id.* at 679.

Here, Defendants argue that Larsen's complaints to both school officials and volunteers were not protected matters of public concern, but rather were expressions to advance his purely private interest to videotape his daughter's performance. (Damerell's Supplemental. Mem. 2-3; Officers' Supplemental Mem. 2-4.); *see, e.g.*, *Cliff*, 42 F.3d at 409-10 (holding that though a teacher's complaints about class size and disorder were of public interest, they were not protected by the First Amendment because they were made in connection with advancing her personal grievance); *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 378-80 (7th Cir. 2009) (concluding that deputy sheriff's published remarks calling attention to sheriff's excesses were not protected speech because they were made for the deputy's personal reasons).

Larsen, on the other hand, responds that his comments touched upon a public concern. (Pl.'s Supplemental Resp. 2.)  Indeed, he seeks to paint himself as a champion of the public, who, like him, were deprived of videotaping the performance.  In that regard, Larsen offers the views of ten other show choir individuals, primarily parents (including his wife), articulated well-after his arrest, who disagree with the school's rule.[21] (Pl.'s Designation of Evidence in Pl.'s Supplemental Mem. Exs. OO, PP, QQ, RR, SS, TT, UU, VV, WW, XX.)  He also seems to suggest that he was simply trying to be the Good Samaritan by "providing information [to the

_____

[21] Larsen also puts misplaced importance on comments made by five unidentified persons during a sixteen minute clip of the Pat White Show, a local radio program that aired following the filing of his lawsuit. (Pl.'s Designation of Evidence. Ex. MM.)  The five opinions were all callers responding to the following question posed by the host: "Would you give [Larsen] the half-a-million dollars if you were on the jury?" (Pl.'s Designation of Evidence Ex. MM.)  Larsen misses the point, because "factors which determine whether a story is newsworthy are hardly coterminus with the factors which determine whether the communication has societal ramifications . . . ." *Egger v. Phillips*, 710 F.2d 292, 317 (7th Cir. 1983), *overruled on other grounds by Feit v. Ward*, 886 F.2d 848, 856 (7th Cir. 1989).  This evidence has an even more attenuated connection to public concerns than mere "newsworthy" evidence.  Here it is Larsen himself, and his lawsuit (not the videography policy), that is "newsworthy." *See also Fruin*, 28 F.3d at 652 n.9 (concluding that an article in *Chicago Tribune* failed to provide evidence of public concern because it did not comprise the disputed speech and instead merely focused on the plaintiff's earlier comments).

school] and asking questions" and that his "point" was to warn the school of "unforeseen consequences" if it failed to garner parental consent for every performer. (Pl.'s Supplemental Resp. 3, 6.)

At bottom, however, Larsen's various grumbles to officials at the event do not rise to the level of public concern as a matter of law. First, he has not shown that the general subject matter of his speech—the videotaping prohibition—is a matter of public concern. The solicited, and *post-hoc* affidavits fail to support Larsen's contention.[22] Indeed, the content of Larsen's speech focused on the application of the show choir rule to him, and it was only when his initial blustering complaints—"I can video tape if I want" and the school does not "have the right to videotape my daughter" (Larsen Dep. 34, 41-42)—proved unsuccessful, that he sought another tack, the role of quasi-legal authority who was only trying to help. The school did not yield to that tactic either. Thus, even if the show choir's fundraising methods could be considered a public concern, Larsen's speech still falls short because it was focused upon the effect on him rather than on the general public. *Marshall*, 32 F.3d at 1219; *see also Button v. Kibby-Brown*, 146 F.3d 526, 529-30 (7th Cir. 1998) ("[S]peech lacks the public concern element if it concerns a subject of public interest but the expression addresses only the personal effect upon the [speaker]." (citation and internal quotation marks omitted)). After all, Larsen never suggests that he ever wanted to videotape any other performance than his daughter's.

Moreover, the context and form prongs of the analysis indicate that the speech in question was nothing more than a personal grievance. Larsen's private interest in filming his daughter prompted rather extensive conversations, and even his "unforeseen consequences"

_____

[22] The affidavits, along with the comments on the Pat White Show, demonstrate at most that Larsen's arrest, not the videography rule, was newsworthy.

comment  (Larsen Dep. 49) was understood, easily it would seem, as a threat of "repercussion . . . through means of legal action" (Pl.'s Designation of Evidence Ex. Y), all of which prompted Damerell's response of "I look forward to hearing from you" (Larsen Dep. 49).  Larsen's speech also occurred in a one-on-one discussion format and solely to the individual officials and volunteers who stopped him from videotaping the show.  That is, he did not raise the issue in a general way with a letter to the editor or at a school board meeting, and he never spoke with any other attendees about the matter, except his wife.  This "tends to confirm" that his personal interest generated and defined his opposition to the rule. *Fruin*, 28 F.3d at 653.  Thus, since his speech was directed solely to officials who were preventing him from filming, he cannot now claim an intent to advance a broader interest.

Consequently, for all these reasons, Larsen's retaliation claim under the First Amendment fails as a matter of law.[23]

## V.  CONCLUSION

For the foregoing reasons, the motion for summary judgment filed by Defendant Assistant Principal Damerell (Docket # 23) is GRANTED, and the motion for partial summary judgment filed by Defendants Officer Glock and Officer Barrientes (Docket # 25) is GRANTED IN PART and DENIED IN PART, in that only the § 1983 false arrest and excessive force claims

---

[23] As stated *supra* in note 2, because the summary judgment motions on Larsen's retaliation claim should be granted even when the evidence Defendants seek to strike is considered, the motions to strike the evidence Larsen submitted with his supplemental response will be DENIED AS MOOT.  The Court notes, however, that Larsen failed to timely respond to the motions to strike his supplemental evidence (*see* Docket # 52, 55, 58-60), and therefore he is exposed to "summary ruling" pursuant to Local Rule 7.1(a). N.D. Ind. L.R. 7.1(a) ("Failure to file a response . . . within the time prescribed may subject the motion to summary ruling."); *Taylor v. Lifetouch Nat'l Sch. Studios, Inc.*, 490 F. Supp. 2d 944, 950 (N.D. Ind. 2007) (granting the defendant's motion to strike because the plaintiff failed to respond); *Hardiman v. Davita, Inc.*, No. 2:05-CV-262-JM, 2007 WL 1395568, at *9 (N.D. Ind. May 10, 2007) (same).  Of course, striking Larsen's supplemental affidavits from the various show choir individuals and the CD of the Pat White Show would only strengthen the Court's decision to dismiss Larsen's retaliation claim.

against Officer Glock and Officer Barrientes survive.  The motions to strike filed by Defendants

(Docket # 33, 50, 53) are DENIED AS MOOT.  Per the parties' stipulation (Docket # 57), all

claims against the Fort Wayne Police Department, John Doe #1, Jane Doe #2, and Fort Wayne

Community Schools are DISMISSED WITH PREJUDICE.

SO ORDERED.

Enter for June 11, 2010.

S/ Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge